Marc **FIEDLER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–96–00864–CR.

Court of Appeals of Texas,
San Antonio.

Oct. 21, 1998.

Rehearing Overruled Nov. 23, 1999.

Mark J. McKay, Law Office of Mark J. McKay, San Antonio, for Appellant.

Barbara Hervey, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, FRANK MALONEY,[1] Justice.

OPINION

MALONEY, Justice (Assigned).

Appellant was charged by indictment with having, on the 12th day of July, 1994, murdered Ilona Albino–Pagan. The jury having found appellant guilty, assessed his punishment at confinement for a period of thirty years in the Institutional Division of the Texas Department of Criminal Justice. Appellant appeals from this judgment asserting two points:

Point One: The trial court erred in failing to suppress his written statement obtained in violation of the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and in violation of Article I, § 10 of the TEXAS CONSTITUTION;

Point Two: The evidence is both legally and factually insufficient.

## POINT II

Conviction in this case was based upon section 19.02 of the Texas Penal Code. That section provides in pertinent part as follows:

> (b) A person commits an offense if he:
>
> > (1) intentionally or knowingly causes the death of an individual;
> >
> > (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual;
> > . . . .

TEX. PEN. CODE § 19.02 (Vernon 1994).

■ When considering a challenge to the legal sufficiency of the evidence, the appellate court considers all of the evidence in the light most favorable to the jury's verdict and determines whether, based on that evidence, any rational jury could find all of the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim. App.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997); *Sonnier v. State*, 913 S.W.2d 511, 514 (Tex.Crim. App.1995); *Rodriguez v. State*, 819 S.W.2d 871, 872 (Tex.Crim.App.1991). The appellate court considers all of the evidence, whether properly or improperly admitted for the jury's consideration. *Rodriguez*, 819 S.W.2d at 873. Although the appellant contends that this case should be considered a circumstantial evidence case and we should utilize the "analytical construct", that principle is no longer utilized in considering challenges to the sufficiency of the evidence. *See Geesa v. State*, 820 S.W.2d 154, 160–161 (Tex.Crim.App.1991).

■ The evidence in this case established that the victim was reported as missing on July 8, 1994 by her family on July 9, 1994. Her body was found on July 12, 1994 in a remote area of Live Oak, Texas. The autopsy established that the victim, a fourteen year old child, had been strangled; there being two knotted ligatures around her neck. Due to the deteriorated state of the remains, the medical examiner's office was unable to detect any sign of sexual abuse. The evidence further showed that the appellant had been the last person to have been with the deceased. Her father testified that he had a phone conversation with his daughter on the 8th of July at about 8:30 p.m., and that the appellant was in the house with her at that time. The confession of the appellant admitted in evidence stating in effect that the appellant utilized a cloth, shirt, or scarf and just held her "away from me" and

> pressed the cloth again away from me . . . and somehow before I knew it, she passed out. I tried to see if she was breathing and checked her pulse on her arm and neck. I couldn't feel anything . . . I took a blanket—don't remember from where—but I put her on it and

1. Assigned to this case by the Chief Justice of the Supreme Court.

pulled her through the garage and turned the jeep around. I put her in the trunk and left . . .

I drove towards Randolph Boulevard . . . I went up there and pulled her out of the car and placed her on her side—I heard a car or people or something so I tried to hide her, covering her with the first thing I saw . . . .

■ The deceased died of unnatural causes, the result of a homicide. The statement of the appellant is sufficient evidence of appellant's identity as the person who caused the death of the deceased. *See Emery v. State,* 881 S.W.2d 702, 706 (Tex.Crim.App.1994). In *Fisher v. State,* the Court of Criminal Appeals stated that although a person may not be convicted upon his confession alone, evidence of the corpus delicti of the crime and the confession is sufficient. *See Fisher v. State,* 851 S.W.2d 298, 302–03 (Tex.Crim.App.1993). Evidence in this case independent of the confession establishes that the crime of murder was committed. *See Fisher,* 851 S.W.2d at 303, relying on *Gribble v. State,* 808 S.W.2d 65, 70 (Tex.Crim.App.1990) (plurality opinion); *Bridges v. State,* 172 Tex.Crim. 655, 362 S.W.2d 336, 337 (App. 1962); *Watson v. State,* 154 Tex.Crim. 438, 227 S.W.2d 559, 562 (App.1950)). In addition to the evidence of the unnatural death of the deceased, the ligatures around her neck causing strangulation,[2] there is sufficient evidence corroborating the confession, establishing the agency aspect of the crime. The record shows that the deceased's father talked to the deceased on the evening of July 8 and then also talked to the appellant, who was with the deceased at that time, on the telephone.

In addition to the confession made by the appellant to the officers, the appellant also stated to an airman assigned to his squadron that he and the deceased were talking and that she grabbed him around the throat. He said that he blacked out, and when he saw her lying there, checked for a pulse and realized she was dead, and left.

We find that the evidence is legally sufficient to support the verdict. *See c.f. Delgado v. State,* 840 S.W.2d 594, 600 (Tex. App.—Corpus Christi 1992, no pet.); *Jackson v. State,* 652 S.W.2d 415, 419 (Tex. Crim.App.1983).

The appellant also maintains that the conviction is factually insufficient to support the verdict. The standard of review for factual sufficiency is for the appellate court to view all the evidence without the prism of "in the light most favorable to the prosecution" and to set aside the verdict only if it is so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996); see *De Los Santos v. State,* 918 S.W.2d 565, 569 (Tex.App.—San Antonio 1996, no pet.).

Recently, the Court of Criminal Appeals emphasized that the review process begins with the assumption that the evidence is legally sufficient under the *Jackson* test. *See Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997) The appellate court considers all of the evidence in the record related to appellant's sufficiency charge—not just the evidence which supports the verdict, reviews the evidence weighed by the jury which tends to prove the existence of the elemental facts in dispute and compares it to the evidence which tends to disprove those facts.

However, factual sufficiency review must be appropriately differential so as to avoid the appellate court substituting its own judgement for that of the factfinder. The court's evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and

---

2. Prosecutor: And please describe for the ladies and gentlemen of the jury what you first observed on the body of Ilona Albino–Pagan when you conducted the autopsy on July 12th of 1994.

Medical Examiner: Well, the first observation included the fact that there was a ligature wrapped around the neck, and then observations about the decomposition of the body and the clothing.

credibility of the witnesses' testimony. The appellate court maintains this deference to the jury's findings, by finding fault only when "the verdict is against the *great* weight of the evidence presented at trial so as to be *clearly wrong and unjust.*"

*Santellan,* 939 S.W.2d at 164–65 (citations omitted). Examples of such a wrong and unjust verdict include instances in which the jury's finding is "manifestly unjust", "shocks the conscience", or "clearly demonstrates bias". *Clewis,* 922 S.W.2d at 135 (citing *Meraz v. State,* 785 S.W.2d 146, 149 (Tex.Crim.App.1990)).

Continuing in *Santellan,* the Court of Criminal Appeals stated that even if the reviewing court discovers that the verdict is against the great weight of the evidence and manifested an unjust result, the court may not render or substitute its judgement for that of the jury. *See Santellan,* 939 S.W.2d at 165. Its only option is to vacate the conviction and remand the case for a new trial. *See Clewis,* 922 S.W.2d at 133–135; *Santellan,* 939 S.W.2d at 165.

The evidence in this case established that the body of the child, when it was found, had two ligatures around her neck, the body was clothed in a red blouse, a bra and red socks. There was no clothing covering the buttocks or genitalia of the body. Because of the decomposition of the body, the medical examiner's office was unable to detect any sign of sexual abuse. The cause of death was strangulation. Two knotted ligatures were removed from the child's body by the medical examiner and released to the Live Oak Police Department. There is no question factually or otherwise that the child's cause of death was due to criminal homicide.

The father's testimony established that the appellant was at their home with the deceased shortly before her disappearance.

In his confession, although he attempts to excuse or justify his conduct on the basis that at the time he was struggling with the deceased he was in a claustrophobic condition, appellant stated that he was terrified and attempted to hold the victim back with a piece of cloth. The appellant stated:

... somehow I freaked, and somehow before I knew it, she passed out. I tried to see if she was breathing and checked her pulse on her arm and neck. I couldn't feel anything.... I got scared and didn't know what to do. I took a blanket—don't remember from where—but I put her on it and pulled her through the garage and turned the jeep around. I put her in the trunk and left—I got over the bridge to the other side of IH–35 and I stopped at the stop sign. I was scared and didn't know what to do.

I drove towards Randolph Boulevard, and I remember the Robards—I went up there and pulled her out of the car and placed her on her side—I heard a car or people or something so I tried to hide her, covering her with the first thing I saw....

The conversations between the father of the deceased, the deceased, and the appellant occurred at approximately 8:30 p.m. on July 8, 1994. When the deceased's mother arrived at home at approximately 1:00 a.m. on July 9, 1994, the deceased, although she had been told to be home by 8:00 p.m. on July 8th, was not at her home.

On the 12th of July, 1994, when the body was discovered, the deceased's mother identified the articles of clothing found with the body. An airman in the same squadron as the appellant stated that the appellant had told him "they were talking and the girl grabbed him around the throat in this manner. He said he blacked out and when he came to, he saw her lying there; checked for a pulse, realized she was dead and left."

Appellant states that there is only one piece of evidence to convict him and that is his written statement. Appellant contends that he provided an alibi for the only possible time when the girl could have been killed, that he provided witnesses to show

that his clothing did not appear to be messed up in a fashion that would have been consistent with someone who had just strangled the deceased, that he cooperated with the authorities under orders from his military superiors, and that he wrote his statement pursuant to force and threats of the police utilizing their notes to concoct a story of how he killed the girl. Appellant argues that from the totality of circumstances and the lack of evidence other than his highly suspect written statement, the reviewing court should set aside the verdict because it is so contrary to the overwhelming weight of evidence as to be clearly wrong and unjust.

The indictment in this case charged in Paragraph A of Count I that the appellant did then and there intentionally and knowingly cause the death of Ilona Albino–Pagan by strangling her with a ligature. In Paragraph B of Count I the indictment charged that the appellant, intending to cause serious bodily injury to Ilona Albino–Pagan, did then and there commit an act clearly dangerous to human life, to-wit: strangling her with a ligature, thereby causing her death.

During the guilt/innocence portion of the trial, the court in its application of the law to the facts portion of the charge advised the jury that in order to convict the appellant they must find beyond a reasonable doubt that the appellant intentionally or knowingly caused the death of Ilona Albino–Pagan by strangling her with ligature or that they must find beyond a reasonable doubt that the appellant did intend to cause serious bodily injury to Ilona Albino–Pagan and did then and there commit an act clearly dangerous to human life, to wit: strangling the said Ilona Albino–Pagan with a ligature and thereby causing her death before they could convict him of the offense of murder. The jury found the appellant guilty of "murder as charged in the indictment."

The court also instructed the jury that in order for the appellant's statement to be considered as evidence against him, it must be shown by the evidence, beyond a reasonable doubt, that it was made freely and voluntarily, without threats, coercion, compulsion, persuasion, or promise of immunity, or any other improper influence; and, that if they failed to find such or had a reasonable doubt thereof, they were not to consider the confession for any purpose whatsoever and draw no inference or conclusion from it, and not consider any evidence obtained as a result thereof.

The jury found against the appellant's contentions that his statement was not voluntary and reconciled whatever conflicts in evidence including the appellant's offer of explanation as to where he was at the time of the death of the deceased against the appellant. As the Court of Criminal Appeals explained in *Clewis*:

> Appellate courts should only exercise their fact jurisdiction to prevent a manifestly unjust result; ... those courts "are not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable."

*Clewis v. State* at 135.

For the reasons stated in *Clewis*, we must accord due deference to the jury regarding the weight and credibility given to the testimony. We see no reason to conclude that the jury's verdict is "manifestly unjust", "shocks the conscience", or "clearly demonstrates bias". *See Clewis*, 922 S.W.2d at 135. It appears from looking at all of the evidence that the appellant intentionally caused the death of the deceased or intending to cause her serious bodily injury did cause her death, and that the jury rejected his explanation concerning his being elsewhere at the time of the death of the deceased. We conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's contention that the case is factually insufficient is overruled.

Having disposed of appellant's points on legal and factual sufficiency, we now con-

sider whether or not appellant's written statement should have been suppressed by the trial court.

## POINT ONE

Appellant maintains that the trial court erred in failing to suppress his written statement which was obtained on the 26th of April, 1995 at Goodfellow Air Force Base (AFB) in San Angelo, Texas by police officers of the Live Oak Police Department. Appellant argues that the statement was obtained in violation of the Fifth and Sixth Amendments to the Constitution of the United States and in violation of art. I, § 10 of the TEXAS CONST., and in violation of art. 38.22 of the TEX. CODE CRIM. PROC.

## FACTS

As previously stated, the victim disappeared sometime on July 8, 1994. The first contact authorities had with appellant was on July 9, at 5:30 in the morning. They arrived at his home in San Antonio, seeking information about the victim.

The next contact was on July 10, 1994; at the request of the authorities, appellant in the accompaniment of his father appeared at the Live Oak Police Department where he presented to the police a handwritten statement dated July 10, 1994. No *Miranda* warnings were given and it is undisputed that at that time appellant was not in custody.

On July 12, 1994, at Goodfellow AFB, appellant was contacted by his supervisor, relieved of duty, and advised to go to his commander's office where he was escorted by his commanding officer to the Office of Special Investigations (OSI). He was questioned in an interrogation room by Officer John Stakes of the Live Oak Police Department and Ranger Gary de los Santos of the Texas Rangers. According to testimony of the appellant, he was accused by them of both raping and murdering the victim and when he tried to leave, they told him to sit down and told him he was not going anywhere. On that day, in addition to signing a typed reproduction of his previously handwritten statement of July 10, he executed a waiver authorizing the officers to search his quarters. He was escorted to his quarters by his commander, Officer Stakes, and Ranger de los Santos. Stakes and de los Santos then searched appellant's quarters and certain articles were taken. On the following day, Officer Stakes and Ranger de los Santos attempted to make further contact with the appellant for the purpose of obtaining body fluid samples, but they were told that he was now represented by counsel and that attempt was terminated.

On July 14, 1994, Officer Stakes received a fax from Captain Martin Hindel, USAF, Area Defense Counsel, stating that he now represented appellant in the matter concerning the victim's death and any further contact with appellant in regards to the case should be made through Captain Hindel. Sometime later, Officer Stakes was informed by OSI that the defendant was now represented by Attorney Alan Place. At the motion to suppress hearing, Stakes testified that he then contacted Place, who stated that he (Place) had never actually talked to appellant about the case and had never agreed to represent him.

Officer Stakes by telephone between July 11, 1994 and April 10, 1995 continued to contact the appellant concerning the case at numerous times. Appellant returned the calls originally placed by Stakes when he had an opportunity to do so. Sergeant Stakes went to San Angelo on one occasion in January 1995 to interview potential witnesses in the case and made his presence known to appellant while in San Angelo.

Sergeant Stakes prepared a set of interrogatories dated March 7, 1995 and faxed them to the OSI office at Goodfellow AFB on April 10, 1995, with a request that appellant answer the interrogatories.

Appellant was requested by his superiors to come to the OSI office and asked if he would provide written answers to the

interrogatories faxed to the OSI by the Live Oak Police Department. The evidence is conflicting as to whether or not appellant reviewed and answered those interrogatories of his own volition. However, it is not refuted that he did answer some of the questions in a room provided by the OSI and that those questions which he did choose to answer were faxed with his answers back to the Live Oak Police Department on April 10, 1995.

On April 26, 1995, Officer Stakes and Assistant Police Chief Pue, of the Live Oak Police Department, traveled to Goodfellow AFB and asked permission of the base commander to talk to appellant about the case. Special Agent John Edward Whitson, OSI, escorted Stakes and Pue to where appellant was and appellant agreed to meet with Stakes and Pue. This agreement apparently took place in a doorless office in appellant's work area. Because of a lack of privacy in the office and numerous interruptions of discussions that Stakes was having with appellant concerning previous statements made by appellant, which according to Stakes, contained "apparent discrepancies in the statements", appellant suggested that Stakes, Pue, and he move to the NCO Club on the base to continue the discussion. At the NCO Club appellant talked to Stakes and Pue in a large bar room area that was fairly vacant.

Pue and appellant discussed the possible consequences of a capital murder conviction. Pue indicated a capital murder conviction was possible if defendant did not cooperate fully with the police. According to the testimony of Stakes, neither he nor Pue ever prevented the defendant from leaving the NCO Club. There is, at this juncture, conflicting testimony as to whether appellant asked for an attorney. Appellant never attempted to assert his right to remain silent during the time he was questioned by Stakes and Pue. In response to Sergeant Stakes' description of his concept of the events surrounding the death of the victim, appellant stated, "It happened just the way you said, Sergeant Stakes." This occurred at 3:30 p.m. and at that time appellant was verbally advised of his *Miranda* rights. It is undisputed that this was the first time he was given his *Miranda* rights by the civilian authorities.

Appellant signed a "waiver-of-rights" form.

After further discussion, appellant agreed to make and sign a written statement. Before he began writing his statement, the room where he was began to fill up with people and appellant suggested that Stakes, Pue, and he move into the "Oasis Room," another large bar area in the NCO Club that had just opened for business.

Defendant was given written materials and a "voluntary admission form" supplied by Stakes. Stakes had previously filled out the form and had inserted appellant's name at the top.

Beginning shortly after 3:30 p.m., appellant wrote by hand and signed a statement on the voluntary admission form. The form contains the *Miranda* rights and a waiver of those rights printed at the top of the form that he signed. Appellant testified at the suppression hearing that he did not read the *Miranda* rights statement printed on the form supplied by Sergeant Stakes. While appellant was writing out his statement, Stakes and Pue sat at another table some twenty-five feet distance from appellant, allowing appellant to sit by himself and have as much privacy as possible.

Appellant signed the five-page statement, which was witnessed by OSI officers, Whitson and Kelley. Appellant was not arrested by the civilian authorities, and remained on the base.

The following day, April 27, 1995, pursuant to a warrant for his arrest obtained by Sergeant Stakes, appellant was arrested on the charge of murder and at that time taken before a magistrate in San Angelo, Texas, where he was read his rights as

required by article 15.17 of the Code of Criminal Procedure.

On October 10, 1995 and November 3, 1995, pre-trial hearings were held on the admissibility of appellant's statements. The trial court filed findings of fact and conclusions of law.[3]

### APPELLANT'S CONTENTIONS

■ Appellant maintains that he invoked his Fifth Amendment right to remain silent, and his Sixth Amendment right to an attorney, prior to providing his written statement of April 26, 1995. Citing *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) as authority for the principle that once an accused has an attorney and requests same, that his constitutional safeguards preserve the sanctity of that relationship, he maintains the evidence established that he had retained the services of two separate attorneys, Captain Martin J. Hindel, USAF, Area Defense Counsel, and Mr. Allan Place; that the Live Oak Police were made aware of this when he invoked his right of silence on July 13, 1994 and when he refused to provide body fluid samples. He asserts that the fax forwarded by Hindel to the Live Oak Police Department constitutes a clear invocation of those rights guaranteed to him by both the Fifth and Sixth Amendments, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. He further asserts that under *Edwards v. Arizona* once his rights have been invoked and once he has stated that he does not desire to converse with the authorities without counsel, the State has a heavy burden to establish a valid waiver. *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

Appellant argues that at no time did he waive his rights, and he did not initiate further discussion with the authorities after invoking his right to counsel, citing *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), and *Murphy v. State*, 801 S.W.2d 917 (Tex.Crim.App. 1991), holding that initiation of questioning of appellant outside the presence of counsel after appellant invoked his right to counsel, precludes the admission of any subsequent statement. The evidence shows that appellant was contacted by the authorities after the fax was received by them, at least by phone, several times each month. Beginning in January of 1995, phone calls were initiated by the Live Oak Police authority to appellant.

Appellant predicates his arguments upon the fact that all interrogations were custodial, citing *Miranda v. Arizona*, wherein the Court said, "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *See Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Appellant maintains that arrest is not required, citing *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), which held that a police department setting is not required to prove custodial interrogation. Appellant maintains that he was a young man of approximately 20 years of age, stationed in the military several hundred miles from his parents and friends, was on-duty when he was approached by the Live Oak Police and was not able to leave the confines of the military base on April 26, 1996. He further maintains that he had been instructed by his superior officers that he was to assist the police in their investigation, that he had only been in the military for a short period of time and was of low rank, trained to follow orders and these orders, along with months of intimidation through telephone calls and threats of capital murder punishment constituted custody. He contends that during the questioning from

---

**3.** Statements: July 10, 1994, July 12, 1994, April 10, 1995, and April 26, 1995. Only the April 26, 1995 statement was offered by the State and admitted as evidence before the jury.

11:30 a.m. until 5:30 p .m. on April 26, the day his statement was given, he was confined to a location under orders to assist the civilian authorities in their investigation.

In the alternative, appellant argues that even if his statement of April 26 was not the product of "custodial interrogation" as defined in *Miranda,* the questioning of appellant without his attorney was highly improper, and constituted a violation of the Fourteenth Amendment to the Constitution of the United States, as well as section 10 of article I of the Texas Constitution. Appellant further maintains that the statement itself was not voluntary because it was the product of a promise of leniency, citing *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

### STATE'S CONTENTION

The State contends in its brief written before the Court of Criminal Appeals decided the cases of *Guzman v. State,* 955 S.W.2d 85 (Tex.Crim.App.1997) and *Loserth v. State of Texas,* 963 S.W.2d 770 (Tex.Crim.App.1998) that courts of appeal apply only an abuse of discretion standard in reviewing a trial court's ruling, that either granted or denied a motion to suppress; that we must give deference to the rulings of the trial court, so long as it appears that the trial court has applied the correct standard of law to those historical facts, citing *DuBose v. State,* 915 S.W.2d 493, and *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

■ The State maintains that at no time prior to or even during the giving of appellant's statement on April 26, 1995, was appellant in custody or was there an adversarial proceeding initiated by the State until after April 26, 1995, when a warrant for appellant's arrest was procured. The State points out that all of the cases relied upon by the appellant involved fact scenarios of an arrest, a custodial interrogation, or threats where adversarial proceedings had been initiated. The State correctly

argues that the *Miranda* requirements of section 2 of article 38.22 of the Code of Criminal Procedure apply only to statements made during the course of custodial interrogation, citing *Parra v. State,* 743 S.W.2d 281, 285 (Tex.App.—San Antonio 1987, pet. ref'd.). The State also cites *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), where the Supreme Court held that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned," and *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), which held that if the circumstances show that an individual acted upon the invitational request of the police and there are no threats, express or implied, that he would be forcibly taken, then the person is not in custody. *See also Chambers v. State,* 866 S.W.2d 9, 19 (Tex.Crim.App. 1993).

The State also maintains that Deputy Chief Pue testified that as soon as the appellant began to give information that appeared incriminating, he stopped the appellant from speaking further, read to him his *Miranda* warnings and gave him a waiver of rights form to execute. The State also contends that the defendant was not with the police in a coercive environment, that appellant had suggested the NCO Club as a place where they could talk; the appellant never asked for an attorney nor did he state that he wished to discontinue his writing. The record shows that the bartender testified that the police were not in the same area as the appellant when he was writing and that they never went near him, nor did he hear them say anything to him while the appellant was writing.

The State correctly acknowledges that the cases of *Upton v. State,* 853 S.W.2d 548, 552 (Tex.Crim.App.1993), in which the Court of Criminal Appeals stated:

Before attachment of the Sixth Amendment right to counsel, if an accused clearly invokes his Fifth Amendment right to counsel *during custodial interrogation by the police*, all interrogation must cease, and any subsequent waiver of counsel, to be effective, must be the product of either accused-initiated communications with the police, or police-initiated communications with the accused in the presence of counsel. (emphasis added)

and *State v. Frye,* 897 S.W.2d 324 where the Court stated:

Both this Court, and the United States Supreme Court have declared once an accused has a lawyer, "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client privilege takes effect." Absent waiver of the right, an important safeguard provided by the Sixth Amendment is the general prohibition of state initiated questioning of an accused who is represented by counsel during all critical stages of criminal proceedings once formal adversarial proceedings have begun, except where counsel is, present or is informed of the interrogation. The problem lies in determining what actions mark the inception of formal adversarial proceedings. (citations omitted)

are applicable, if appellant on April 25, 1995 was represented by counsel. However, the testimony of Captain Hindel and of Officer Stakes negate that he was represented by counsel.

The State contends that Officer Stakes unequivocally testified that he did not believe that appellant was represented by counsel; that his contact with both Hindel and Place led him to believe that appellant was not represented by counsel; and, that appellant never requested the services of an attorney at the time of his statement.

Therefore, it was not an abuse of discretion to deny appellant's motion to suppress his confession, appellant not being in custody and no adversarial proceedings having begun.

### TRIAL COURT'S RULING

The trial court, applying the four factors of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to the situation as it existed during the questioning of the appellant at the NCO Club, determined that there was no probable cause to arrest until appellant made his first oral admission of guilt, that the subjective intent of the police being to obtain an admission of guilt from appellant, he being the focus of the investigation, did not amount to custody and that at no time during the questioning did appellant believe that he was under custodial restraint. The trial court stated, "Balancing the four ... factors, defendant's confession made on the afternoon of April 26, 1995 was voluntary and not made while the defendant was subject to custodial restraint." Denying his motion to suppress, the trial court stated, "Since all statements made by defendant were voluntary, they are fully admissible as evidence against defendant as is any evidence obtained in connection with these statements."

### LAW

 We begin our discussion with the issue of custody,[4] recognizing that if an investigation is not at the accusatorial or the custodial stage, a person's Fifth Amendment rights have not yet come into play and the voluntariness of his statement is not implicated. *See Rodriguez v. State,* 939 S.W.2d 211, 215 (Tex.App.—Austin 1997, no pet.). We reiterated in *Rodriguez v. State* that voluntariness is an issue only if the confession was obtained while the speaker was in custody and neither *Mi-*

---

4. Appellant made both federal and state constitutional claims, but does not argue that the concept of custody differs under these two types of claims. Because appellant's only developed argument about custody is in regard to a federal constitutional claim, we will analyze the issue from a federal constitutional perspective and presume the state law standard to be the same. *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996).

*randa* nor article 38.22 apply to statements that were not the result of custodial interrogation. *See Rodriguez*, 939 S.W.2d at 215 (relying on *Kelley v. State*, 817 S.W.2d 168, 173 (Tex.App.—Austin 1991, pet. ref'd), *Morris v. State*, 897 S.W.2d 528, 531 (Tex.App.—El Paso 1995, no pet.), *Galloway v. State*, 778 S.W.2d 110, 112 (Tex.App.—Houston [14th Dist.] 1989, no pet.)).

▮ In *Miranda*, the United States Supreme Court defined custodial interrogation:

"Custodial interrogation" is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.

*See Cannon v. State*, 691 S.W.2d 664, 671 (Tex.Crim.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). In determining whether an individual is in custody, the Court examines all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was either a formal arrest or restraint of movement of the degree associated with formal arrest. *See California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). In *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), the Supreme Court established the rules for determining whether a person being questioned by law enforcement officers is held in custody and thus entitled to *Miranda* rights. The Supreme Court made it clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officer or the person being questioned. *See Stansbury*, 511 U.S. at 323–24, 114 S.Ct. 1526 (adopting the "reasonable person test" enunciated in *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

In *Rodriguez v. State*, we stated:

The four factors test appears to retain little or no viability since the Court of Criminal Appeals has adopted the reasonable person test of *Stansbury*.

*Rodriguez v. State*, 939 S.W.2d at 216. As the Court of Criminal Appeals stated in *Dowthitt*:

a person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. The "reasonable person" standard presupposes an *innocent* person. Moreover, the subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect.

In the past, we have recognized four factors relevant to determining custody:

(1) Probable cause to arrest,

(2) Subjective intent of the police,

(3) Focus of the investigation, and

(4) Subjective belief of the defendant.

Under *Stansbury*, factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials; the custody determination is based entirely upon objective circumstances.

*Dowthitt*, 931 S.W.2d at 254 (citations omitted). The Court of Criminal Appeals went on to state:

We have outlined at least four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. Concerning the first through third situations, *Stansbury* indicates that the restriction upon free-

dom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. Concerning the fourth situation, *Stansbury* dictates that the officers' knowledge of probable cause be manifested to the suspect. Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Moreover, given our emphasis on probable cause as a "factor" in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.

*Id.* at 255. In *Dowthitt,* the defendant went to the police station at about 9:00 a.m. to give a written statement, finished and signed the statement at 11:00 a.m. He left and returned and asked if he would be allowed to change his earlier statement because it contained a false alibi. He was interrogated sporadically until 6:00 p.m. when his second written statement was signed. There were no *Miranda* warnings on the second statement. The police suggested that the defendant take a polygraph test, due to the inconsistencies between the two statements. He agreed and the test began at 7:00 p.m. Initially, he was told he was not a suspect. The procedure required the reading of certain warnings. At that point, he was read his *Miranda* warnings. At the beginning of the examination, he stated he was exhausted. At the end of the test at about 11:00 p.m., he was told that he had not been completely truthful about everything. He asked to be allowed to talk to his wife. Intensive questioning began. Somewhere around midnight, he claimed to have chest pains and requested he be allowed to talk to his wife. He was offered some cinnamon rolls to eat. He declined and the interrogation became more intensive with the defendant complaining about his head splitting. He final-

ly admitted that he was there (at the scene of the murders) the whole time—"got out of control too fast". The interrogating officer then stated, "It got out of control too fast and it was all over before you even thought to try to stop it." Another officer stated, "You knew what was happening was wrong, and you couldn't stop it." Defendant then said, "All right, man. I'm going to tell you you're right, but I can't say more than that. I need to rest." His admission occurred the following morning at 1:00 a.m. The interrogation continued and defendant gave the details of what he observed at the crime scene, but he did not admit to participation in the murders. He was told by the police that he was "not going home tonight". After that interview, they began working on defendant's third written statement. The third written statement essentially repeated the facts, admitted he was present during the crime, and gave details of his observations. During the interrogation, he never asked to leave and he never chose to exercise his right to remain silent. He was questioned during the trial and admitted that this was true. An arrest warrant was not procured until the afternoon of June 21, interrogation having occurred on June 20 and June 21.

The Court of Criminal Appeals emphasized that "at 1:00 a.m. a significant circumstance occurred,"

> [A]ppellant admitted that he was present during the murder. After that admission, especially in light of appellant's earlier evasions and inconsistencies, the police had probable cause to arrest.

*Dowthitt v. State,* 931 S.W.2d at 256. The court thus indicated that this crucial admission turned a non-custodial encounter into a custodial one that was, in effect, triggering the necessity that all defendant's rights be enforced. The court went on to hold that:

> While appellant did not admit to committing the offenses, his admission that he was present during the murders was

incriminating, and a reasonable person would have realized the incriminating nature of the admission. Given the length of the interrogation, the existence of factors involving the exercise of police control over appellant (accompanying him at restroom breaks, ignoring requests to see his wife), and appellant's damaging admission establishing probable cause to arrest, we believe that "custody" began after appellant admitted to his presence during the murders.

*Id.* at 257. We find that *Dowthitt* controls. As soon as appellant made the statement, "It happened just the way you said, Sergeant Stakes," the police had probable cause to arrest appellant. A reasonable person would have realized the incriminating nature of such an admission. This admission, at least from the time it was made, turned what was arguably a noncustodial encounter into a custodial encounter.

 The appellant argues that because he was in the military and was ordered by his superiors to assist in the investigation, he was in custody from the first encounter with Sergeant Stakes at Goodfellow AFB on July 12, 1994, and that the fax from Captain Hindel advising Sergeant Stakes that he was not to contact appellant without Captain Hindel's "express permission" invoked his right to legal counsel during any interrogation of appellant.

 The issue of custody controls as to whether or not appellant's Fifth and Sixth Amendment protections have come into play. *Miranda* and article 38.22 of the Code of Criminal Procedure apply only to statements made as a result of custodial interrogation. *See Rodriguez,* 939 S.W.2d at 215. If the military and civilian authorities were working together, and appellant was ordered by the military authorities to make a statement to the civilian authorities, this could be considered a custodial encounter.

During the October 10, 1995 hearing, Live Oak Police officers Stakes and Pue testified, as did the appellant. Both officers testified that the appellant was not in custody until they made a formal arrest on April 27, 1995, the day following his inculpatory statement. The State also called Captain Martin Hindel, who testified that he usually advises military personnel that he cannot represent them if the investigation concerns charges being filed off the base, although he did not have a specific recollection as having done so in this case. The trial court had before it all of the statements of appellant, the fax from Hindel, the Waiver of Rights signed by appellant, and the Consent to Search signed by appellant.

At the November 3, 1995 continuation of the motion to suppress hearing, the trial court heard testimony from Special Agent John Whitson, OSI, TSgt. Brian Bylsma, USAF, who was in charge of the Security Police Investigation Section at Goodfellow; TSgt. Thomas Huber, a USAF criminal investigator at Goodfellow; and A. Jeffrey, a non-commissioned officer with the 17th Security Police Squadron, Goodfellow AFB.

There is no evidence in the record from any military authority that the military was requiring appellant to give a statement to civilian authorities. To the contrary, Special Agent John Whitson, OSI, stated as follows:

Q. Did you indicate yourself to Marc (appellant) that he was under orders to talk with Stakes and de los Santos?

A. No, ma'am . . .

They [Stakes and de los Santos] did come back the next morning, and I informed them that I believed that Marc was seeking legal counsel and I wasn't sure he was going to want to talk to them . . .

At a later part of his testimony, he stated:

I told him (appellant) that Dan Pue and John Stakes wanted to speak with him about the .incident in Live Oak. I told him I wasn't going to speak to him about

the matter, and I asked him if he would like to speak to them. And he agreed that he would.

Still later in his testimony:

Q. While you were handling him, while you were assisting Live Oak, did you ever in any way tell Marc [appellant] that he had to help Live Oak, that he had to answer the questions and he had to comply with anything?

A. No, ma'am. That would be highly irregular for anyone in OSI to do that. Because with Marc being an airman and several people who outrank him or would be his superior, we try not to do that.

The only evidence that appellant was ordered to cooperate with the civilian authorities in their investigation is from appellant.[5]

Recently, the Court of Criminal Appeals extended the *Guzman* standard as to review of trial court's rulings on motions to suppress evidence involving Fourth Amendment grounds to rulings on motion to suppress evidence involving tainted in-court identification on due process Fourteenth Amendment grounds. *See Loserth*, 963 S.W.2d at 773–74; *Guzman*, 955 S.W.2d at 87.

In *Guzman*, the Court of Criminal Appeals explained that the *Guzman* decision did not call into question the very definition of abuse of discretion, which is the standard of appellate review, but merely that an abuse of discretion standard does not necessarily apply to application of law to fact questions, whose resolution do not turn on evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 87.

■ In *Loserth*, the Court of Criminal Appeals stated:

As a general rule, the appellate courts, including this Court should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on the evaluation of credibility and demeanor.

*Loserth*, 963 S.W.2d at 772 (quoting *Guzman*, 955 S.W.2d at 89). The same rule is based upon application of law to fact questions, also known as mixed questions of law and fact, if the ultimate resolution of those questions turns on the evaluation of credibility and demeanor. By that is meant that where there is mixed law and fact issue, the evaluation of credibility and demeanor of one or more witnesses, if believed, is always enough to add up to what is needed to decide the substantive issue, then the court should not proceed to a *de novo* decision on appeal. Otherwise, the appellate court should proceed to a *de novo* decision in mixed law fact issues.

---

5. Although we are not bound by opinions of the United States Court of Military Appeals, we note that Article 31 of UNIFORM MILITARY CODE OF JUSTICE contains the same rights that *Miranda v. Arizona* requires be given to all persons who are subject to custodial interrogation. Interpreting that article, in the case of *United States v. Larry D. Oakley, Jr.*, 33 M.J. 27 (United States Court of Military Appeals, 1991), that Court held that as staff sergeant's advice to accused to cooperate with civilian police officers did not overcome accused's will in violation of Article 31. *Oakley, Jr.*, 33 M.J. at 32. The accused's cooperation was a result of his freely drawn conclusion that it was in his best interest to cooperate. *Id.* And in *United States v. Goudy*, 32 M.J. 88 (United States Court of Military Appeals, 1991), it was held that the accused's consent to search was voluntary despite his testimony that he took his company commander's request for consent as an implied order. *Goudy*, 32 M.J. at 90. In that case, the accused acknowledged that he was never overtly ordered to comply and that he was orally admonished by an investigator that he did not have to give his consent, under Article 31 of the United States Code of Military Justice. *Id.; see also United States v. Jones*, 6 M.J. 770 (United States Army Court of Military Review, 1978) (holding that the fact that a person is easily led or of low mentality does not per se render any confession made by him inadmissable). The record in *Jones* established that accused's extrajudicial confessions were made voluntarily. *Jones*, 6 M.J. at 775.

The Court cited *Hunter v. State,* 955 S.W.2d 102 (Tex.Crim.App.1997), a case that involved a question of whether or not the appellant was "detained" under Fourth Amendment principles. The Court held that in that situation the analysis should be entirely *de novo.* *See Loserth,* 963 S.W.2d at 773.

Turning now to the trial court's rulings here on the motion to suppress the statements in question as stated above, the trial court denied the motion, finding in effect that all statements given by the defendant were voluntary, that the defendant was not in custody at any time, even at the time he made his April 26, 1995 admission. Therefore, neither the Fifth or Sixth Amendments to the Constitution of the United States, nor section 10 to article I of the Texas Constitution and/or article 38.22 of the Texas Code Criminal Procedure precluded the admission of the statements by the State.

Although we find that the findings of fact as stated and filed by the trial court are consistent with our review of the record, we find that the trial court's ruling concerning whether or not the appellant was in custody after making his admission on April 25, 1995 to the effect that "It happened just the way you said, Sergeant Stakes", was incorrect. The appellant from that time on was being subjected to custodial interrogation. *See Dowthitt,* 931 S.W.2d at 254. The evidence shows that the defendant, at that time, received his *Miranda* warnings and executed a waiver concerning same, that there was no request for counsel prior to, during, or after the defendant made his statement. Although it is true that a formal arrest did not occur until the following day, still the doctrine of incustodial interrogation requires that the *Miranda* rights of the defendant be scrupulously honored, as they were in this case. *See Nenno v. State,* 970 S.W.2d 549, 556–57 (Tex.Crim.App. June 24, 1998). We find that the trial court's denial of appellant's motion to suppress was not an abuse of discretion.

Having found no reversible error, the judgment of the trial court is affirmed.