**UNITED STATES, Appellee,**

v.

**Larry D. OAKLEY, Jr., Specialist, U.S. Army, Appellant.**

**No. 65,948.**
**CM 9000774.**

U.S. Court of Military Appeals.

Argued May 8, 1991.

Decided Aug. 20, 1991.

For Appellant: *Captain Holly K. Desmarais* (argued); *Major Michael J. Kelleher* (on brief).

For Appellee: *Captain Randy V. Cargill* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Timothy W. Lucas* (on brief).

### Opinion of the Court

EVERETT, Senior Judge:

Contrary to Oakley's pleas, a general court-martial including enlisted members convicted him of forgery of checks, bank documents, and credit-card charge slips (4 specifications); larceny of property valued at over $2,509.46 (7 specifications); conspiracy to commit larceny; conspiracy to commit forgery and larceny; wrongful use of a military identification card; forgery of credit-card charge slips for merchandise valued at a total of $194.52 (6 specifications); and larceny of property valued at a total of $1,314.05 (3 specifications). *See* Arts. 123, 121, 81, and 134, Uniform Code of Military Justice, 10 USC §§ 923, 921, 881, and 934, respectively. Thereafter, the court-martial sentenced appellant to a bad-conduct discharge, confinement for 3 years, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed in a short-form opinion.

We granted review of these issues:

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING DEFENSE COUNSEL'S MOTION TO SUPPRESS STATEMENTS GIVEN BY APPELLANT WITHOUT AN ARTICLE 31(b) RIGHTS ADVISEMENT.

II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO RECUSE HIMSELF AT THE REQUEST OF DEFENSE COUNSEL, PURSUANT TO RULE FOR COURTS–MARTIAL 902.

III

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING DEFENSE COUNSEL'S REQUEST FOR A CONTINUANCE SO THAT ALL CHARGES COULD BE TRIED TOGETHER, AND GRANTING THE GOVERNMENT'S REQUEST THAT THE CHARGES BE SEVERED.

After fully considering the arguments of both parties on all three issues, we affirm.

I

When the military judge arraigned appellant, civilian defense counsel indicated that she wished to litigate "several motions before the court." The first motion, now at issue in this appeal, was "to suppress all statements of the accused, as well as the fruits of any of those statements." When the military judge inquired as to the basis of her motion, counsel responded, "The basis is a lack of Article 31(b) rights advisements to the accused."

It was uncontested at trial that Oakley was timely read his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but that he never was advised of his related but more expansive rights under Article 31(b), UCMJ, 10 USC § 831(b). *See generally United States v. Lewis*, 12 MJ 205 (CMA 1982)(Rights under Article 31 offer "broader protection than the Fifth Amendment."). The key to appellant's complaint in this Court is the extent of the participation of Army Staff Sergeant Tyson Stanley in the investigation that ultimately led to Oakley's court-martial.

A

Detective Winn of the Clarksville, Tennessee, Police Department had been conducting a civilian fraud investigation involving two soldiers at Fort Campbell, Kentucky, named Burnette and Ivey. Before interviewing them, Winn paged Sergeant Stanley to come to the local police station.

Stanley was assigned to the Civil Liaison Section of the Law Enforcement Command at Fort Campbell. As he explained during

his testimony, his office "run[s] coordinations between Law Enforcement Command and off-post authorities, the courts, civilian police, attorneys, Department of Human Services, any agencies off post—anything involving service members off the installation." When queried as to why Winn had paged him, Stanley responded: "When they're dealing with a military [member] off-post, I get called in on it to keep the chain of command here briefed and maintain cooperation between" military and civilian authorities.

Winn briefed Stanley on his investigation. Then, Stanley sat in on and, to an unspecified extent, asked questions during the interviews of Burnette and Ivey. During these interviews, Winn learned "that one of the subjects [Burnette] had been staying with Mr. Oakley and that some of the property involved in this case was at Mr. Oakley's house."

Accordingly, Winn and another civilian detective named Runyon decided to go to Oakley's house, and Stanley accompanied them. It then was approximately 1:30 a.m. When Oakley came to the door, Winn introduced himself and Detective Runyon, as well as "Liaison Officer Sergeant Stanley." He informed Oakley that they were conducting a fraud investigation. He explained that they "believed some of the property was" in Oakley's house and, after reading to Oakley a form entitled "Permission to Search," asked Oakley to sign it. Oakley did so, and both Winn and Runyon signed as witnesses.

Thereupon, Winn told Oakley that they were looking for a stereo system that Burnette had brought to the house; and he asked Oakley to point it out, which Oakley did. Although Winn did not then suspect Oakley of any wrongdoing, "Runyon verbally Mirandize[d] Mr. Oakley over his rights as far as he didn't have to tell us anything else and he didn't have to show us anything else; and Mr. Oakley seemed very cooperative at the time and willingly showed us a lot of other items that had been also fraudulently bought or purchased.".

Stanley testified that he observed Winn's and Runyon's search of Oakley's house, but he himself did not participate in it. Indeed, once Oakley had pointed out the stereo in the lower level of the split-level house, Stanley went to the upper level to calm Oakley's parents—who were visiting Oakley and were quite upset over the early-morning interruption.

While he did not remember doing so, Stanley acknowledged that "[t]here is a high probability that" he advised Oakley that it would go better for him "in the long run" if he cooperated with the civilian police. It had been Stanley's experience with the local authorities that "[t]he more cooperation, the more leniency the courts have tended to show toward the individual." However, he testified that no one discussed the possibility of a court-martial with appellant. He explained that, in his over 5 years' experience at Fort Campbell, he had never seen a case investigated by civilians later turned over to military authorities.

"[A]fter we loaded up most of the property," Winn asked Oakley and his wife to accompany them to the police station "to be interviewed about the situation." At the station, Winn and Sergeant Stanley entered the interview room where Oakley was waiting. Winn testified that "at this point it did—you know, it did begin to look like maybe he was involved in it." Accordingly, Winn read Oakley his *Miranda* rights, read to him a waiver form, had Oakley examine the form himself, and asked Oakley whether "he understood it." Oakley "said he did" and signed it; Winn and Stanley signed the form as witnesses.

After Winn had interviewed Oakley for approximately 1 hour, Oakley wrote an unsigned statement detailing his involvement with a person whom he variously referred to as "Charles" and "Chuck" in a scheme in which they used credit cards and identification from a wallet that Charles had found at a picnic area. They used the cards to buy certain products and used the cards and identification to open a bank account on which they fraudulently wrote several checks for other goods.

On a second page of the statement—a page that Oakley did sign—six questions and answers appear. The first four questions were written out by Winn, and the last two by Stanley; those last two questions and Oakley's answers are as follows:

Q. Did Scott Ivey have any knowledge that the furniture bought at the auction was pur[chas]ed illegally?

A. Yes.

Q. Who switched the ID's and credit cards from one wallet to another and why?

A. I did because they were laying in a drawer in my attic and I didn't have anything to put them in so I put them in one of my old wallets.

Winn made clear in his testimony that the investigation he had conducted was on behalf of the Clarksville Police Department and that, at the time, he had no idea that the military ultimately would take jurisdiction of the matter; he fully expected that the investigation would culminate in a local civilian trial. Indeed, Winn revealed that the civilian authorities had taken Oakley through arraignment and a preliminary hearing in the local justice system and that the case had been bound over to the grand jury—all before the matter was transferred to the military's jurisdiction. When asked to clarify Stanley's presence, Winn explained:

Just as a—he's the liaison officer that's between our department and the military and when we—many times when military personnel are involved in a case, especially suspects looks like they're going to be arrested on felony charges, we usually call him to let him know.

After the prosecution had presented its evidence on the motion, Oakley, his wife, and his mother testified. Appellant indicated that, at the house, no one had talked to him "about potential military involvement." At the police station, however, Stanley told Oakley before the interview began: "You need to really cooperate. I'm your military liaison; I'm the go-between between you and the military. If you cooperate and everything down here, every-

thing will be okay at work and you'll be just fine." Appellant's wife, too, testified that, the whole night, Stanley kept repeating to Oakley that he "should cooperate all you can so that you're—you will get out of this a lot better."

Finally, appellant's mother, Mrs. Davis, testified. She confirmed that, while her son was going around the house with the civilian detectives, she was in the kitchen with Stanley, who

had introduced himself right after he got there and said he was from the military, that he was the liaison officer; any time something happened to one of the boys in the military that he was always there, you know to help protect—I don't know whether he actually said help protect the boys from the military or as that he just had to be there, but I took it as he was there to make sure that Larry's rights weren't violated or anything, just to watch actually what was going on.

Mrs. Davis revealed that her son had acted quite differently in response to Sergeant Stanley from how he had to the civilian detectives. She said that if the police asked her son to do something, "he would be kind of hesitant as to whether, you know, to do it or not." On the other hand, "if Sergeant Stanley would say—Now like Sergeant Stanley did say, 'Larry, you need to cooperate, you know,' he said, 'because you're in a world of trouble here. These are serious charges.' So as soon as Sergeant Stanley would say that, then of course Larry immediately, you know, he did, said, whatever he was supposed to, you know." At some point in the house, "Sergeant Stanley told me, he said, 'Yes, he's going to need a lawyer, that he's in serious trouble.'"

### B

In her argument in support of the motion, defense counsel urged that Sergeant Stanley—"a person subject to the code"—had participated in the investigation. Thus, counsel asserted, Mil.R.Evid. 305, Manual for Courts–Martial, United States, 1984, required that Oakley be advised of his Article 31 rights prior to the search and

the interrogation. In particular, defense counsel complained that Oakley had not been advised of the nature of the offense of which he was suspected, the fact that a statement could be used at a court-martial, or that he was entitled to a trial defense attorney. *See* Mil.R.Evid. 305(c)(1) and (3) and (d). Counsel contended:

Had Sergeant Stanley not participated [in the investigation], then there wouldn't be a problem under the Military Rule of Evidence 305. Under that rule if there is no person subject to the Code who participates, then the question is sort of a conflicts of law question. Is this statement admissible in a Tennessee court? However, in this case Sergeant Stanley did participate; he participated in this entire investigation, beginning with the statements taken from Private Burnette and Specialist Ivey....

Notwithstanding, the military judge entered these relevant findings of fact: The court is convinced by a preponderance of the evidence:

First, that this was a civilian police investigation;

Secondly, that Staff Sergeant Stanley was present with civilian police at the Oakley home since a soldier was involved;

Third, that Staff Sergeant Stanley was a liaison officer at that time and not an investigator;

\* \* \*

The court specifically finds that Staff Sergeant Stanley exceeded his authority in participating in the questioning of Specialist Oakley at the Clarksville Criminal Law Complex. Those questions that he authored and the responses to them will be excluded as a violation of Article 31(b), but there is an insufficient—there is insufficient evidence to show that his participation was required by any official requirement but was a result of personal curiosity.

So that it's [the motion to suppress] granted as to those questions which he authors and any response to his since 31(b) would apply to him.

But the court is convinced that this was a civilian investigation without military participation.

### C

■ Under the specific terms of Article 31(b), the requirement to advise a suspect of his rights applies only when the questioning is done by a "person subject to" the Uniform Code of Military Justice. Consistent with this Court's opinions, *see, e.g.,* *United States v. Penn,* 18 USCMA 194, 39 CMR 194 (1969), the reference in Article 31(b) to "[a] 'person subject to the code' includes a person acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(1). Absent this inclusion of civilian agents, Article 31(b) could be readily circumvented.

In arguing for application of Article 31(b), appellant contends that Sergeant Stanley's "participation" reflected a joint investigation by civilian and military law-enforcement authorities and that any action taken by the civilian police in that joint investigation was, as a matter of law, an action by "a person acting as a knowing agent of a military unit or of a person subject to the code." *See* Mil.R.Evid. 305(b)(1); *United States v. Jordan,* 29 MJ 177 (CMA 1989), *vacated and remanded,* — U.S. —, 111 S.Ct. 575, 112 L.Ed.2d 580 (1990); *United States v. Quillen,* 27 MJ 312 (CMA 1988).

Unfortunately for Oakley, the record clearly supports the contrary finding by the military judge. There was no evidence at all of any military involvement in this investigation until the civilian authorities already had Ivey and Burnette in custody. Moreover, at all stages thereafter, the civilian authorities undoubtedly were in charge of the direction of the investigation and were in pursuit of a civilian trial and conviction, notwithstanding Stanley's shadowing their steps. Indeed, both Stanley and Winn testified that, in their several years' experience, they knew of no prior instance in which civilian jurisdiction to try a crime

under these circumstances subsequently had been yielded to the military.

Although Stanley improperly did ask Oakley questions during the interrogation, this activity was limited to the last two questions in that session; and these were innocuous and relatively inconsequential to the investigation. In all other respects, the conduct of the investigation was by the civilian agents in contemplation of civilian criminal charges to be tried in a civilian court system. Accordingly, the evidence does not require a legal conclusion that the investigation was a joint effort between military and civilian police such that the civilian police officers had become knowing agents of the military.

█ Alternatively, regardless whether the facts reflect a true joint investigation, appellant urges that his testimonial acts and his oral and written statements were the direct result of Sergeant Stanley's admonishments to him to cooperate—admonishments from a military superior that were unaccompanied by any Article 31 rights advisement. *See generally United States v. Duga*, 10 MJ 206 (CMA 1981) (effect of subtle influence of military relationships on decision to talk). As set out earlier in this opinion, there is some evidence that Stanley did give advice such as this to Oakley on one or more occasions.

Other evidence, however, tends to diminish the importance of such advice in determining whether Oakley acted in response thereto. For instance, all the evidence indicates that no advice of this nature was offered before Oakley responded to Winn's request to be shown Burnette's stereo equipment. Moreover, all the evidence reflects that, for the most part thereafter, Stanley spent his time calming Oakley's mother in the kitchen—and not as part of the Oakley–Winn–Runyon party that paraded throughout the house.

No precedent of this Court of which we are aware would support a conclusion that the facts of this case (even viewed in the light most favorable to Oakley, which is *not* the appropriate view to be taken on appeal) demonstrate that appellant's testi-

monial acts or his statements were "compel[led]" in violation of Article 31(a). There is no hint that Stanley's advice to cooperate was meant to deceive Oakley or in any way trick him into a more malleable state. *See United States v. Murphy*, 18 MJ 220, 239 (CMA 1984) (Everett, C.J., joined by Fletcher, J., concurring in the result). Instead, to whatever extent Stanley's advice in some way affected Oakley, the totality of the circumstances convinces us that Oakley's subsequent cooperation was the result of his own freely drawn conclusion that it was in his own best interest—both with the civilian authorities and with his military superiors—to cooperate, especially in view of his awareness that Ivey and Burnette already had been interrogated and had cooperated. *See United States v. Murphy, supra* at 226–27 (Cook, J.); 242 (Everett, C.J., joined by Fletcher, J., concurring in the result).

It is uncontroverted, of course, that Winn—not Stanley—"request[ed]" the statements from Oakley; and the answers to the two questions that Stanley did ask were suppressed at trial. For purposes of Article 31(b), Winn's requests could be imputed to Stanley—"a person subject to the code"—only if theirs was a joint effort; and the military judge properly rejected this possibility. Therefore, appellant's entitlement to a rights warning was governed "by the principles of law generally recognized in the trial of criminal cases in the United States district courts involving similar interrogations." Mil.R.Evid. 305(h)(1). Under those "principles," Oakley clearly had no right to the expanded warning.

Accordingly, we conclude that Oakley's cooperation with civilian police at his house and later at the police station was a result of the intelligent exercise of his own free will and that Sergeant Stanley's advice to Oakley to cooperate with the civilian authorities in his own self-interest did not overcome Oakley's will to do otherwise.

## II

█ At the point in the trial when the military judge asked Oakley whether he

had a challenge for cause against the judge, the following exchange occurred:

MJ: Before we go into that, Specialist Oakley, I'm sure your counsel have informed you of the fact that I presided over—I don't know if it was Specialist Burnette or Private Burnette—but at that point I presided over Burnette's trial; it was a guilty plea; it was by judge alone. I also presided over a case involving Specialist Ivey. That case involved a guilty plea with members, but I was the judge in both of those. I know your name has come up in the course of both of those trials. Predominantly, I think it was during Burnette's trial as I recall. I have made no determination one way or the other concerning your guilt or innocence or what would be an appropriate sentence should you be found guilty.

Does defense have any further voir dire?

DC: Sir, we don't have any further voir dire but we still move for a recusal under R.C.M. 902 based on the reasonable appearance of [ ]partiality. Further, the court's prior determination of disputed evidentiary facts—we are aware that your knowledge has come only from your judicial functions; however, the general nature of the case law states that if there are facts which even tend to raise a doubt as to defense of the proceedings a challenge is appropriate and we would rest our challenge on that basis.

MJ: Just so we have that straight, you're saying my determination . . .

DC: As to the suppression motions.

MJ: Okay. I'll state this for the record. The decisions I made in those cases, Burnette's case and also in Ivey's case, were based solely on the evidence. If the evidence comes out different this time, I'll have no problem ruling otherwise. I don't feel bound by any ruling I made in the other cases. Each case will be determined based on the evidence I hear. I guess it's a challenge for cause. Your request for recusal is denied at this point.

Thereupon, Oakley presented an earlier-signed, written request to be tried by a panel consisting of at least one-third enlisted members.

Appellant makes clear in his brief in this Court what appears to have been his complaint at trial: At the earlier trials of Oakley's alleged cohorts, the military judge had denied suppression motions and had ruled that the guilty pleas of both accused were provident; in the course of doing so, the military judge had made certain "determinations" which Oakley disputed in large part in his subsequent suppression motion—discussed earlier in this opinion—and in his contested trial; and this reasonably raised the question of the military judge's impartiality to try Oakley. *See* RCM 902(a), Manual, *supra.*

In support of his position, appellant relies in substantial part upon *United States v. Bradley,* 7 MJ 332 (CMA 1979). There, the accused "had tendered pleas of guilty to" most of the "specifications laid against him"; and the military judge had accepted those pleas and entered findings of guilty after a thorough providence inquiry. During the subsequent trial on the remaining specifications, it had come to light that the Article 32, UCMJ, 10 USC § 832, officer in the case "had considered . . . statements which purported to be sworn but which," as the testifying investigating agent knew, had not been sworn.

At that point defense counsel had moved to withdraw the accused's guilty pleas, which the military judge had permitted for good cause shown. After further litigation concerning this matter, defense counsel had moved for the military judge's recusal based on his earlier acceptance of provident guilty pleas. The military judge had denied the motion but had offered the accused the opportunity "to withdraw his [earlier] request for trial by judge alone," which the accused had "declined." 7 MJ at 333.

This Court held that, when acting on the accused's recusal motion, the military

judge should have either recused himself or, inasmuch as an accused has no absolute right to trial by judge alone, directed a trial by members. *Id.* at 334. In doing so, we acknowledged that,

> simply because a judge may have been made aware of certain factual circumstances involved in a case does not *necessarily* mean that he is disqualified to continue to preside.... This is true even when the judge has gained knowledge regarding the circumstances surrounding the offense itself through judicial inquiry into a guilty plea tendered by the accused but later rejected by the judge because the accused in the inquiry had set up matter inconsistent with guilt. Mere exposure to such information does not *necessarily* cause the judge to have reached any conclusions about the accused's culpability and legal liability and the judge's "philosophical credentials [as a trained jurist] are sufficient to bar the appearance of impurity ..."

*Id.* at 334 (citations omitted). Nonetheless, this Court concluded:

> In a case such as this, where the judge not only has gained detailed knowledge of the factual basis for the offenses charged but also necessarily has been required to reach certain conclusions regarding an accused's factual and legal guilt—and to have *manifested* those conclusions by having accepted pleas of guilty and entering findings of guilt—both the fact and the appearance of "impurity" are presented by the judge's continuing to act as the factfinder in the trial.

*Id.* at 334 (citations omitted).

Of course, two significant distinctions between *Bradley* and this case immediately spring to mind. First, the military judge here did not try Oakley as the factfinder; he continued to preside as the judge, but appellant was tried, pursuant to his signed request, by a panel of officer and enlisted members. Trial by members is, it will be recalled, one of the alternatives that *Bradley* instructed was available when the fact

or appearance of the judge's "impurity" has been raised.

Admittedly, in *United States v. Sherrod*, 26 MJ 30, 32 (CMA 1988), we indicated that recusal and directed trial by members are not evenly balanced alternatives. Nonetheless, where Oakley's request for members had been signed even before his unsuccessful litigation of the recusal motion, and in the absence of any affirmative indication in the record that he would have withdrawn that request if his recusal motion had been granted, we see no basis here for concluding, as we did in *Bradley*, that appellant's interest in a fair trial—in fact and in appearance—before a forum of his choice has been compromised.

Second, the type and quality of the conclusions purportedly reached and manifested by the judge in *Bradley* were quite different from those in issue here. In *Bradley*, the conclusions related to the legal and factual guilt of the accused standing before him. As to Oakley, any conclusions purportedly reached by the judge were in separate trials of alleged cohorts and were based solely on the evidence in those trials. That evidence may or may not have been the same as the evidence in appellant's trial; and it did not necessarily relate to the legal or factual guilt of the subject accused. Instead, it related only to suppression motions and to providence of guilty pleas tendered by Burnette and Ivey.

The military judge here manifested his sensitivity to the situation by raising the matter himself. Upon doing so, he assured the defense that he would resolve any motions and determine Oakley's guilt solely on the evidence presented in that courtroom and that he would not be affected by any evidence presented in the earlier trials of Burnette and Ivey. Furthermore, he pledged that he had reached no conclusions about Oakley's guilt or, if guilty, as to an appropriate sentence.

We have no doubt that such a situation would not lead to forced recusal of a judge in a United States district court under a rule substantially identical to RCM 902(a). *See, e.g., United States v. Studley*, 783 F.2d 934 (9th Cir.1986); *United States v. Parker*, 742 F.2d 127 (4th Cir.), *cert. de-*

*nied,* 469 U.S. 1076, 105 S.Ct. 575, 83 L.Ed.2d 514 (1984); *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982) and 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Winston,* 613 F.2d 221 (9th Cir. 1980); *United States v. Partin,* 552 F.2d 621 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Similarly, we decline to hold that RCM 902—or any other authoritative consideration—forces recusal here. Accordingly, this issue is without merit.

### III

■ During the litigation of the suppression motion discussed earlier in this opinion, the military judge indicated he would grant the defense a short recess to study a relevant Supreme Court opinion. At this point, the following exchange ensued:

MJ: ... Also, it's come to my attention that Additional Charges III, IV, and V were served on the accused last Friday. Now, is the accused aware of his rights to five days after the service of charges on him before he can come to trial on those charges?

IDC: Yes, Your Honor.

MJ: Do you understand that, Specialist Oakley?

ACC: Yes, sir.

MJ: Okay. Is it your desire to waive those five days and go to court on those charges today?

(Defense counsel and accused confer together.)

MJ: Okay. During the recess you can discuss that while you also look at the ...

IDC: Right. We'll do that.

After the recess, proceedings resumed, and the parties resolved the evidentiary matter. Thereafter, they turned again to the question of the waiting period:

MJ: ... Has the accused made up his mind reference the five day ...

IDC: Yes, Your Honor, the accused would not waive the five-day requirement as to Additional Charges III, IV, and V.

MJ: Okay. So that those charges at this point then will be severed from the case, or does the government desire a continuance until the five days is met?

IDC: If Your Honor please, the defense would also request a continuance since it doesn't seem—we would prefer not to have to try everything separately. This is—we have here a motion for consolidation also. We have here the same conspiracy charge, the same principals involved, the same time period involved, and from the point of view of the defense, we would like to present our defense all at the same time and not be required to sever our case.

MJ: Wait a minute. You're saying it's the same conspiracy as to Additional Charges III, IV, and V?

IDC: Yes; it involves both Burnette, who is a major witness in that, and Sergeant Collier, who is also a major witness in part of the alleged conspiracy.

MJ: Trial Counsel, what's the government's desires?

ATC: Your Honor, the government strongly opposes any continuance in this case and requests that you would sever the trial. The government's position is that the principals are not the same in Additional Charges III, IV, and V as they are in the original charges and Additional Charges I and II. In addition, Your Honor, the government has gone to great expense in bringing witnesses here today to include one witness who's been flown in from Hawaii for trial today. The government would request you sever Additional Charges III, IV, and V to be tried at a later date and continue on with the original charges and Additional Charges I and II.

\* \* \*

MJ: Well, at this point I'm going to grant the government's motion. I'll allow the accused to invoke his rights and at this time Additional Charges III, IV, and V and their Specifications are severed. Those will be sent back to the convening authority for what action he deems appropriate at a later time.

In this Court, appellant's complaint is succinctly stated: "Appellant had the right to have his charges served five days before trial, and he also had the right to present his defense all at one time. He should not have been required to choose between the two." Oakley's *right* to a 5–day waiting period in this general court-martial during time of peace is clear, *see* Art. 35, UCMJ, 10 USC § 835; RCM 602. However, his *right* "to present his defense all at one time" is not so clear—and his claim thereto in this Court is unadorned with citation of authority.

Unquestionably, there is a policy preference in the military justice system to try all known charges against an accused at the same time. *See, e.g.,* RCM 601(e)(2) ("In the discretion of the convening authority, two or more offenses charged against an accused may be referred to the same court-martial for trial, whether serious or minor offenses or both, regardless whether related."); RCM 906(b)(10), Discussion ("Ordinarily, all known charges should be tried at a single court-martial."). Such a scheme serves the obvious interest of administrative ease for the Government; and often it will result in a lower sentence for the accused than if the charges are tried separately. *See United States v. Haye,* 29 MJ 213, 215 (CMA 1989).

Nonetheless, in any particular case, a difficulty may arise which makes slavish adherence to this otherwise sensible preference impractical, or worse. Thus, the Discussion to RCM 906(b)(10) of the Manual comments: "For example, when an essential witness as to one offense is unavailable, it might be appropriate to sever that offense to prevent violation of the accused's right to a speedy trial."

Even more directly relevant to Oakley's situation, RCM 601(e)(2) states: "Additional charges may be joined with other charges for a single trial at any time before arraignment if all necessary procedural requirements concerning the additional charges have been complied with." Of course, the logical inverse is that additional charges may *not* be joined with other charges for a single trial if all necessary procedural requirements concerning the additional charges—such as the 5–day waiting period following service of the additional charges—have *not* been complied with.

This crystalizes the difficulty with appellant's argument that he was denied one right (joinder of the additional charges with other charges) by his insistence on another right (the 5–day waiting period following service of the additional charges). In fact, however, both appellant *and* the Government were denied a *discretionary preference* (the joinder) by appellant's insistence on a *right* (the waiting period). This is precisely what RCM 601(e)(2) and the Discussion of RCM 906(b)(10) acknowledge might sometimes be necessary.

This is not to say that, under all circumstances, such a denial of a discretionary preference as the quid pro quo for an accused's insistence on a right is permissible. Where, for instance, the circumstances demonstrate no sound reasons for denying the preference, we might have another view. The problem in such a case, however, would not be that the preference somehow magically has energized itself into a right; rather, it would be that imposing a severance, without sound reasons for doing so, is nothing less than an effort by the prosecution either to extort a price from the accused for insisting on the right to a waiting period or to blackmail the accused into relinquishing the right.

Here, the Government urged sound practical reasons for trying the remaining charges that day: Both sides were prepared to try them, and several witnesses— one who had come from quite some distance away and at some inconvenience— were present and ready to proceed. Under these circumstances, we cannot agree with appellant that the military judge abused his discretion in severing the recently served charges but proceeding with trial on the remaining charges.

## IV

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judge COX concur.