# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 39751

————————————

## UNITED STATES
*Appellee*

**v.**

## Zakery J. SCHRAM
Airman Basic (E-1), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 4 December 2020

————————————

*Military Judge:* Mark F. Rosenow.

*Approved sentence:* Dishonorable discharge, confinement for 8 years, and forfeiture of all pay and allowances. Sentence adjudged 30 March 2019 by GCM convened at Davis-Monthan Air Force Base, Arizona.

*For Appellant:* Major Benjamin H. DeYoung, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH and Judge MEGINLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

The case before us is Appellant's second court-martial.[1] A general court-martial composed of officer members found Appellant guilty, contrary to his pleas, of one specification each of aggravated sexual assault of a child (ML) on divers occasions, aggravated sexual assault of ML, aggravated sexual abuse of a child (ML) on divers occasions, and sexual assault of NM on divers occasions, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (Charge I); and three specifications of assault consummated by a battery of NM, one of which was on divers occasions, in violation of Article 128, UCMJ, 10 U.S.C. § 928 (Charge II).[2,3] Appellant was sentenced to a dishonorable discharge, confinement for eight years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

Appellant raises four issues on appeal: (1) whether the evidence is legally and factually sufficient to support the convictions for offenses against NM; (2) whether the military judge erred when he did not recuse himself from presiding over Appellant's court-martial; (3) whether the staff judge advocate's recommendation (SJAR) to the convening authority and addendum properly advised the convening authority of the correct clemency options; and (4) whether the military judge erred in denying the defense motion to exclude the testimony of ML, or dismiss the specifications relating to her in Charge I, because she testified as a witness under Mil. R. Evid. 413 or 414 at Appellant's prior court-martial.[4] We have carefully considered issue (4), which Appellant personally raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find it does not require further discussion or warrant relief. *See United States*

---

[1] In his previous court-martial, this court affirmed the findings and sentence to a dishonorable discharge, confinement for five years, total forfeitures, and reduction to E-1. *See United States v. Schram*, No. ACM 38954, 2017 CCA LEXIS 350 (A.F. Ct. Crim. App. 22 May 2017) (unpub. op.), *rev. denied,* 2017 CCA LEXIS 862 (C.A.A.F. 5 Sep. 2017).

[2] All references in this opinion are to the *Manual for Courts-Martial, United States* (2016 ed.), including Appendix 28, as applicable.

[3] Appellant was acquitted of one specification of aggravated sexual contact with a child (ML), and three specifications (Specifications 1, 2, and 5) of assault consummated by a battery (NM).

[4] ML was not a named victim in Appellant's previous court-martial, but testified at Appellant's prior court-martial to the conduct that is charged in the court-martial now before this court. ML was 15 years old at the time of the alleged offenses against her and 18 years old at the time of Appellant's previous court-martial.

*v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Finding no error that materially prejudiced Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

Appellant and then-Airman First Class NM met around July 2014 through their duties in the aircraft maintenance squadron at Davis-Monthan Air Force Base, Arizona. They spent off-duty time together at Appellant's apartment and carpooled to work in her vehicle. Appellant began calling NM his girlfriend and NM "was fine with him at that time, so [she] didn't disagree." They went on one "date," to a restaurant. While they were planning to travel to Texas to attend NM's sister's graduation from basic training, NM's family said they could not share a room unless they were married. Appellant asked NM, "You want to get married then?" to which she replied, "Okay." They married at the local county courthouse in September 2014. In November 2014, they moved from his apartment to a house.

When Appellant and NM met, Appellant was under investigation for charges which were the subject of Appellant's previous court-martial. NM attended Appellant's trial in June 2015, after which he was convicted and imprisoned. She signed a letter for Appellant to provide to the convening authority requesting clemency. She visited Appellant while he was confined locally, and wrote him intimate letters. NM stated she did these things because she knew Appellant wanted her to, she did not want to anger him, and she wanted him to feel better.

NM was deployed the first half of 2016, and in October 2016 filed for divorce from Appellant. NM's divorce from Appellant was final in May 2017. Five days later NM reported the allegations before this court against Appellant to Air Force Office of Special Investigations agents. By the time of Appellant's second court-martial, NM was married to an Airman whom she met at work in July 2015 and had started dating sometime after Appellant's first court-martial.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of the findings of guilt with respect to NM. The focus of Appellant's assignment of error is NM's credibility. Appellant claims NM was not a credible witness for the following reasons: (1) she failed to report, and she specifically denied, any alleged wrongdoing previously; (2) she continued to support Appellant during his court-martial and some period of his confinement; (3) she had a religious motive to lie; (4) she had a romantic motive to lie; and (5) her "story was wildly inconsistent over time" and "suspiciously similar" to a victim in Appellant's previous court-

martial, raising reasonable doubt. We are not persuaded by Appellant's claims and conclude the convictions are legally and factually sufficient.

## 1. Additional Background

At trial, NM described Appellant as "a very jealous person" and "very controlling." For example, Appellant would not "allow" NM to wear perfume or talk to men at work, or wear more revealing shorts or shirts outside the home. He timed her trips home from work, and would question her if the commute took her a minute longer than he expected. If she wore lacy underwear to work, he would get angry and accuse her of wearing them for someone else. Once, he demanded to smell her underwear to "see if [she] had been cheating on him." On her phone and social-media accounts, he either would not allow her to have, or demanded to know, the password. He usually would monitor her phone calls, sometimes making her use the speakerphone. He got angry when her car was parked next to someone he disliked, and when her relationship with her sister was too close. Appellant regularly called NM derogatory names and laid blame on her for his shortcomings, telling NM "if [she] was a better wife, he would be a better husband." He sometimes angrily confronted NM at her workplace, usually when her lunch break was delayed or she had to work late. He required her to awaken before him, around 0300–0400, to make coffee and "start the coals," then wake him up so "they would be ready for him to just get on his [computer or video] game and start smoking his hookah."

NM described the effect of Appellant's behavior on her. She felt she couldn't do anything or go anywhere without his approval. She "would just go along with whatever he wanted" and "[i]t almost seemed like he wanted to live [her] life for [her]."

NM described several instances of Appellant's violence towards her during arguments in their home, including those for which Appellant was convicted. At one point, Appellant slapped NM with an open hand (Specification 3 of Charge II). She had tried to dodge the blow, which struck her on the eye, causing a bruise. On another occasion, Appellant pushed her onto the couch and told her she could not get up. When she tried to get up, he pushed her back down. NM said something that angered Appellant greatly, and he "got up and he started beating down on [NM's] head with both of his closed fists" (Specification 4 of Charge II). She saw "stars," and the next day had nausea, soreness, and a headache. Another time, while NM sat on their bed, "something [NM] had said caused him to lift his right foot and kick" NM, causing an open wound on her big toe (Specification 6 of Charge II).

NM also described occasions when Appellant sexually assaulted her by penetrating her anus. On the eve of her twenty-first birthday, Appellant and NM went for a walk near their home. Appellant wanted to have sex outside, and

NM reluctantly agreed. They engaged in vaginal sex, then Appellant pushed his penis inside NM's anus. She protested physically and verbally. Appellant got angry with NM and finally stopped penetrating her. He threw across the street a glass special to NM that she had been carrying. She retrieved the glass, which hadn't broken. Appellant convinced her to give it to him, denying he was going to throw it. When she gave it to him, he threw it and it shattered. NM then ran away down the road as he chased her, convinced he was trying to hit her.

NM testified Appellant had anal sex with her multiple times against her wishes. She recalled that it happened more than once in the shower:

> I remember that, um, he was behind me and he wanted anal sex, and he would hold me and just hold me there until he pushed himself inside of me. And at this time I remember I was crying, and I remember that it hurt, and he kept going until he finished. And once he finished he got out of the shower, and I was in so much pain that I could not move.

Whenever NM was asked about the causes of her injuries, or whether she felt safe at home, she lied. When she went to the hospital for a possible concussion, she "made up a story." Because she falsely said she had been drinking and must have blacked out when she fell and hit her head, she was required to go to a local alcohol-treatment program. When she sought medical treatment for her big toe, she said she stubbed her toe. She did not tell the truth "because [she] knew that if [she] had told them that [Appellant] would most likely hurt [her] more."

NM did not report Appellant's behavior to her family, friends, coworkers, law enforcement, or medical personnel. She explained Appellant "monitored everything [she] did." When anyone asked, she affirmatively denied any abuse at home.

NM had several reasons for staying in the relationship with Appellant. She loved him. She was taught through her Christian faith that divorce was a last resort. She believed Appellant when he told her she would never find someone as good as him. She believed Appellant when he said he would not hurt her again.

The Government offered testimony and documentary evidence to support NM's testimony. When they were apart, Appellant and NM communicated with each other using Facebook Messenger. In messages between them, NM told Appellant in a sarcastic tone that she was leaving work and going to the hospital for a concussion, to which Appellant replied, "Awesome, is that why the [S]hirt wants to talk to me?"

In their testimony, the medical providers that NM saw for her head and neck pain and her lacerated toe confirmed NM's complaint of injury, as well as her "story" about what caused the injuries. They also agreed NM's injuries were consistent with her allegations against Appellant. One provider believed the head and neck pain was not consistent with a fall because she would expect to see additional injuries. The Government introduced some evidence Appellant may have been in the room when NM talked to the provider about her head injury. The Government introduced the photo NM took of her lacerated big toe and sent to her sister.

Some of NM's coworkers saw Appellant's controlling behavior in her workplace and bruising to her upper arm. They noticed she started wearing her uniform blouse in the hangar, even in the height of summer in Arizona, and she stopped interacting with her male coworkers. In 2016, after her deployment, NM told her friend over the phone briefly that she "was forced to have anal" with Appellant. In April 2017, around NM's birthday, NM took a walk with her sister around the neighborhood. NM emotionally pointed out things related to the "incident," including where her favorite glass broke.

Appellant and NM messaged each other after the sexual assault near the home. NM reminded Appellant "it hurt" even as she "was saying wait[.]" Later in this conversation, NM accused Appellant of going to see "[m]aybe someone who likes it up the a[*]s" and further messaged, "You'll be so much happier then. My p[**]sy isn't good enough for you."[5] Appellant responded, "Lmmfao[6] keep goin[g]."

The messages also corroborate NM's characterization of Appellant being very controlling of her. Topics include, *inter alia*, her manner of dress and underwear, speaking to men, waking up early to prepare his coffee and hookah, and accusing her of being a horrible wife. They also show Appellant monitoring NM's conversations, replying with profanity (e.g., "f[**]k [yo]u"), and calling her derogatory names.

---

[5] The military judge instructed the members they could consider these statements of NM only for the purpose of providing context for Appellant's responses, or lack thereof, and to put the entire conversation into context, but not for the truth thereof.

[6] Testimony indicates this refers to laughing.

**2. Evidence Admitted Pursuant to Mil. R. Evid. 413 and 404(b)**[7]

The Government introduced Appellant's previous convictions for violations of Articles 120, 120b, and 128, UCMJ, 10 U.S.C. §§ 920, 920b, and 928. Specifically, the evidence showed Appellant was found guilty of divers sexual assaults against EB (both penile/vaginal and penile/anal), and abusive sexual contact of RM (touching her buttocks); sexual abuse of HS, a child (placing her hand on his penis through the clothing); and assaults consummated by a battery against MZ (striking her head, choking her neck, pushing her body, and grabbing her arms, all on divers occasions).

The members heard testimony of one of these victims, EB, admitted pursuant to Mil R. Evid. 413. She testified about her relationship with Appellant, whom she described as "really controlling." Appellant texted her "all the time," controlled what she wore and who she talked to, insisted on knowing her passwords, and called her derogatory names. EB described occasions on which Appellant grabbed and pushed her, and sexually assaulted her vaginally and anally, including in the shower. EB stayed with Appellant for two years because she "loved him, and [she] didn't think that [she] would have anything else after [she] left him" and she "tried to fix what was wrong with [her], or what she thought was wrong with [her], because [she] loved him and [she] thought he loved [her] too."

The military judge provided the members instructions on evidence and testimony admitted pursuant to Mil. R. Evid. 413 and 404(b). Regarding Appellant's sexual offenses against EB, HS, and RM, the military judge instructed the members they could consider this evidence and testimony "for their tendency, if any, to show [Appellant's] propensity to engage in acts alleged in Charge I and its specifications."[8] Regarding other misconduct, the military judge instructed the members they could consider evidence of Appellant's physical or emotional abuse of NM, ML,[9] EB, and MZ for the limited purpose of explaining Appellant's intent and motive, if any, to dominate and control

---

[7] Appellant unsuccessfully moved to exclude evidence under Mil. R. Evid. 404(b) and 413. On appeal, Appellant does not challenge the military judge's ruling and we find no basis in the record to do so ourselves.

[8] He added that they could consider this evidence "for the limited purpose of explaining [Appellant's] intent and motive, if any, to dominate and control women within dating and intimate relationships" and to determine Appellant's "intent and motive, if any, to commit any of the charged offenses in this court-martial."

[9] ML testified to Appellant's controlling behaviors as well as the substance of the sexual offenses against her alleged under Charge I.

women within dating and intimate relationships, and they could consider this evidence in determining Appellant's intent and motive, if any, to commit the charged offenses.[10] He warned them they could not consider this evidence for any other purpose, "unless identified separately by the Court," nor conclude from it that Appellant is a bad person or has general criminal tendencies and therefore committed the offenses charged.

**3. Law**

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'"

---

[10] The military judge also instructed the members they could consider evidence of physical and emotional abuse of the named victims "for its bearing, if any, on her decisions regarding reporting the charged offenses and to rebut any charge that she recently fabricated her allegations or has testified from a recent improper influence or motive."

*Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

For Appellant to be found guilty of sexual assault of NM in violation of Article 120, UCMJ, as charged in Specification 5 of Charge I, the Government was required to prove beyond a reasonable doubt that on divers occasions Appellant committed a sexual act upon NM by causing bodily harm to her, specifically penetrating her anus with his penis, without her consent.[11] *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM),* pt. IV, ¶ 45.a.(b)(1). For Appellant to be found guilty of assault consummated by a battery of NM in violation of Article 128, UCMJ, as charged in Specifications 3, 4, and 6 of Charge II, the Government was required to prove beyond a reasonable doubt that Appellant did bodily harm to NM with unlawful force or violence. *See MCM,* pt. IV, ¶ 54.b.(2). Specifically, the Government alleged that Appellant struck NM on the face with his hand (Specification 3); struck NM on the head with his hand on divers occasions (Specification 4); and kicked NM on the toe with his foot (Specification 6).

**4. Analysis**

Appellant questions the legal and factual sufficiency of Specification 5 of Charge I and Specifications 3, 4, and 6 of Charge II based solely on the credibility of NM. Appellant's attacks on NM's credibility are not new; he raised them at trial. We are convinced any rational trier of fact could have found the essential elements of the crimes against NM of which Appellant was convicted beyond a reasonable doubt.

The Government proved Appellant abused NM by striking her head multiple times, striking her face, kicking her toe, and anally penetrating her on at least two occasions. The Government proved these offenses primarily with NM's testimony, supported by medical testimony and records, as well as evidence of other misconduct to explain Appellant's intent and motive to dominate and control women within dating and intimate relationships. The best explanation for NM's failure to report, denial of harm, and supporting Appellant through trial and post-trial is Appellant's control over her. Even when he was confined, she acted in accordance with what she believed were his wishes. With time and separation, that control dissipated.

---

[11] By specifically alleging the conduct was without consent, the Government was required to prove lack of consent in order for Appellant to be convicted. We note that to prove "bodily harm," the Government was required to prove an offensive touching, which could include nonconsensual sexual contact. *See MCM*, pt IV, ¶ 45.a.(g)(3).

We are unconvinced NM's religious or romantic views provided a motive for her to fabricate Appellant's violence towards her. The evidence does not support Appellant's claims that NM's family would only approve of a divorce if NM reported to law enforcement officials that Appellant sexually and physically assaulted her. If NM needed an excuse to divorce Appellant, she could point to his prolonged incarceration for sexual and physical offenses against a girl and two young women. Similarly, it would be speculative to find that NM fabricated Appellant's violence to somehow advance her relationship with her then boyfriend.

NM's story was not "wildly inconsistent over time" as claimed. While she lied during her marriage to Appellant about harm she suffered, she stayed consistent in her later description of that harm. Finally, one easily could find that the similarity between NM's testimony and any previous victim's testimony is not because NM observed the previous victim testify four years earlier, but because the women were abused by the same person in a similar way. We have no reason to doubt the members followed the military judge's instructions about the allowable uses of other misconduct and propensity evidence. *See United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012).

Considering the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of Specification 5 of Charge I and Specifications 3, 4 and 6 of Charge II. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Challenge of the Military Judge

### 1. Additional Background

The military judge served as a senior trial counsel and as the Special Victims Unit Chief of Policy and Coordination from 2014 to 2016, in the two years leading up to his assignment as a military judge. In that capacity, then Major (Maj) Rosenow[12] was involved in drafting template responses for the government on new legal issues, including challenges based on changes to preliminary hearings under Article 32, UCMJ, 10 U.S.C. § 832.

The military judge was detailed to Appellant's court-martial on 8 November 2018. The next day, the military judge conducted a telephonic scheduling

---

[12] In this opinion, we use "Maj Rosenow" when referring to the military judge when he was a senior trial counsel.

conference with counsel under Rule for Courts-Martial (R.C.M.) 802. Trial defense counsel provided notice that Appellant would elect to be tried by officer members. The military judge "alerted the parties to his brief and limited involvement in the processing of [Appellant's] previous court-martial" relevant to whether he was disqualified. He had "no concerns about [his] ability to serve as the detailed military judge."

In the hearing leading to arraignment, trial defense counsel orally moved for the military judge to recuse himself. After the military judge stated he was aware of no grounds for challenge against him, he allowed counsel to question him. Trial defense counsel elicited that trial counsel in the previous court-martial—who was the same trial counsel in the present court-martial—requested a template response to an issue related to Appellant's Article 32, UCMJ, hearing. Also, a different prosecutor—whom Maj Rosenow knew when they were defense counsel—reached out to him for a template on a different Article 32, UCMJ, issue in that case. Maj Rosenow provided this prosecutor a template response.

The military judge reviewed this court's decision in Appellant's previous court-martial when it was released, as was his practice, and after he was detailed to Appellant's present court-martial as military judge. He read it again the morning of the motion hearing "and it jogged nothing other than what [he] remember[ed] from reading the appellate decision the last time."

The military judge had looked through his files and found no indication of involvement beyond providing those template responses. He stated he did not discuss the merits of Appellant's previous court-martial with those prosecutors or provide tailored advice. He was not involved in charging. He did not supervise senior trial counsel or review their case reports. Even if he had more involvement in Appellant's case than he could remember at the time, "in terms of independent recollection of Airman Schram, [he had] no recollection at all."

After answering all of trial defense counsel's questions, the military judge stated, "If it wasn't clearly implicated on the record before, my going-in position, certainly, is that under [R.C.M.] 902 I have no concerns about my ability to serve as an impartial military judge in this case. And I don't believe that my impartiality can be reasonably questioned." He then allowed the Defense to make an oral argument and gave them time to put a motion for recusal in writing. After receiving and considering those, the military judge denied Defense's motion. In his oral ruling, he stated, "I don't have any concerns about any impartiality or bias towards or against any party, any knowledge of the case, or anything that would be disqualifying under [R.C.M. 902's] subsections. I also don't believe a member of the public fully informed could reasonably challenge my impartiality in this case." The military judge also issued a detailed written ruling denying the defense motion.

### 2. Law

We review a military judge's decision not to recuse himself for an abuse of discretion. *See United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge's ruling constitutes an abuse of discretion if it is arbitrary, fanciful, clearly unreasonable or clearly erroneous;" the standard is not merely if we have a difference of opinion or would reach a different conclusion. *Id.* at 453 (citing *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)) (internal quotations marks omitted).

R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)). In addition, R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself," including when "the military judge has acted as counsel, preliminary hearing officer, investigating officer, legal officer, staff judge advocate, or convening authority as to any offense charged or in the same case generally." R.C.M. 902(b)(2).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle. . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). A military judge "should not leave a given case 'unnecessarily.'" *Wright*, 52 M.J. at 141 (quoting R.C.M. 902(d)(1), Discussion). That is, a "judge has as much obligation not to disqualify himself when there is no reason to do so as he does to disqualify himself when the converse is true." *United States v. Kincheloe*, 14 M.J. 40, 50 n.14 (C.M.A. 1982) (alterations, internal quotations, and citations omitted).

"Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to *voir dire* the military judge and to present evidence on the question, and where such record demonstrates that [an] appellant obviously was not prejudiced by the military judge's not recusing himself, the concerns of R.C.M. 902(a) are fully met." *United States v. Campos*, 42 M.J. 253, 262 (C.A.A.F. 1995) (citation omitted).

### 3. Analysis

At the outset, we note the record does not show the military judge acted as counsel, preliminary hearing officer, investigating officer, legal officer, staff

judge advocate, or convening authority as to any offense charged or in Appellant's case generally, which would be disqualifying under R.C.M. 902(b)(2).

On appeal, Appellant claims a "reasonable man, knowing that the military judge in the present case was involved in helping the government successfully prosecute Appellant in a prior case that is so interrelated to the present case, might reasonably question the judge's impartiality." Additionally, he highlights that a prosecutor to whom Maj Rosenow sent a template was also a prosecutor in Appellant's second court-martial, and some of the victim-witnesses are the same. Appellant states his "forum choice to not appear before Judge [Rosenow] reflects that he was not unaffected by the appearance of partiality in this case."

We find the military judge did not abuse his discretion in denying the defense motion to disqualify him from presiding over Appellant's court-martial. First, we disagree with Appellant that the military judge "was intimately involved in Appellant's first court-martial, and that he took a position in clear contravention to Appellant's interests involving an important and contested trial matter" and "provided tactical level guidance." Maj Rosenow provided to prosecutors template responses based on the emergence of new legal issues and with no knowledge of any specific facts of Appellant's case. He knew nothing about the charging scheme, the victims, or the witnesses. We see no evidence the military judge knew the content of the filings in Appellant's first court-martial, the strategy the prosecutors chose, or whether they were successful. He reviewed this court's decision on appeal, as many other military justice practitioners do, and had no recollection of any personal involvement in the case.

We also disagree with Appellant's assertion on appeal that "the role [the military judge] played in Appellant's previous case undoubtedly factored into his decision to be tried by officer members, rather than [the military judge]." We note that at the same conference in which the military judge disclosed his limited participation relating to Appellant's first court-martial, Appellant provided notice of his intent to be tried by officer members. This timing strongly suggests Appellant did not factor in the military judge's involvement in Appellant's previous case and instead had different reasons for choosing to be tried by a panel of officers. Moreover, Appellant gave no indication that his forum choice would change if his motion for the military judge to disqualify himself was successful. *See United States v. Oakley*, 33 M.J. 27, 34 (C.A.A.F. 1991) (finding no basis to conclude appellant did not get a fair trial based on forum choice when appellant's request for members had been signed before the military judge denied his recusal motion, and he gave no affirmative indication that he would have changed his request if his motion had been granted).

13

Finally, we find the concerns of R.C.M. 902(a) were fully met. *See Campos*, 42 M.J. at 262. The military judge gave full disclosure of his previous involvement with Appellant's previous court-martial, and provided a full opportunity for counsel to question or "voir dire" him and to present evidence and argument on the motion. Moreover, we see no indication in the record that Appellant was prejudiced by the military judge's failure to disqualify himself. *See id.*

Based on the foregoing, we find Appellant has not overcome the high hurdle to demonstrate bias on the part of the military judge. We are satisfied that a reasonable person knowing all the circumstances in this case would not question the military judge's impartiality.

## C. Erroneous Advice to the Convening Authority

Appellant requests this court direct new post-trial processing or, in the alternative, reduce Appellant's period of confinement due to errors in the SJAR and addendum thereto provided to the convening authority. We are not persuaded.

### 1. Additional Facts

The military judge *sua sponte* merged Specifications 1 and 2 of Charge I for purposes of sentencing. He instructed the members that in determining an appropriate sentence, they must consider them as one offense. He correspondingly advised them that the maximum punishment to confinement was 81 years and 6 months. Before the merger, the maximum imposable confinement was 101 years and 6 months.

Appellant was convicted of offenses committed as early as October 2011 and as recent as June 2015. During that period, Congress changed the law governing what relief a convening authority could grant an appellant in clemency. *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113–66, § 1702, 127 Stat. 954–58 (2013) (codified at 10 U.S.C. § 860(c)(4)(A)). For offenses before 24 June 2014, convening authorities had unfettered discretion to grant clemency, including setting aside a finding of guilt. For offenses on or after 24 June 2014, convening authority discretion was limited to a prescribed set of circumstances. Because the specifications for which Appellant was convicted included dates both before and after 24 June 2014, Appellant was entitled to the convening authority's unfettered discretion in clemency for all convicted offenses. *See* National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113–291, § 531(g)(2)(A), 128 Stat. 3292, 3365–66 (2014); *see also United States v. Rogers*, 76 M.J. 621, 626 (A.F. Ct. Crim. App. 2017) ("We will not conduct a post-trial dive below the charged dates to attempt to determine with certitude when an offense occurred for Article 60, UCMJ, purposes.").

Despite the fact that one of the specifications Appellant was charged with committing included an offense before 24 June 2014, the acting staff judge advocate erroneously advised the convening authority in the SJAR that he had "the authority to approve or disapprove the finding of guilt for Charge I and all Specifications *except Specification 5*" and "[f]or Charge II and its Specifications, *[he] only [had] the authority to approve the finding of guilt and cannot dismiss the finding of guilt.*" (Emphasis added). Regarding sentence, the SJAR correctly advised the convening authority he had "the authority to disapprove, commute or suspend the adjudged sentence."

In the Defense's clemency submission, trial defense counsel did not correct the error in the SJAR regarding the power of the convening authority to affect the findings. Although trial defense counsel alleged errors at trial, the only relief he requested from the convening authority was reduction or disapproval of Appellant's sentence to confinement. In the addendum to the SJAR, the staff judge advocate did not correct the erroneous advice in the SJAR regarding the convening authority's power to affect the findings, but then provided incorrect advice about the power he did have to affect Appellant's sentence. The SJAR misadvised that "[u]nder R.C.M. 1107(d)(1)(B), a convening authority may not disapprove, commute, or suspend, in whole or in part, that portion of an adjudged sentence that includes confinement for more than six months or a dishonorable discharge" and that "[i]n this case, no exceptions to this rule exist." The convening authority approved Appellant's sentence as adjudged.

Following Appellant's assignment of error, we granted the Government's motion for leave to attach to its motion the convening authority's declaration regarding the effect of the erroneous advice he received from his acting staff judge advocate in the SJAR and from the staff judge advocate in the addendum.[13] In it, the convening authority stated his "action in this case would not have been impacted had [he] received [accurate] advice at the time of clemency." He "considered all of the matters in clemency" at the time he took action, and while he recognized Appellant's mitigating evidence, "his offenses were repeated and severe." He concluded, "Considering the entirety of the record, I am confident that I still would have approved the findings and sentence as adjudged by the court-martial."

### 2. Law and Analysis

"The proper completion of post-trial processing is a question of law the court reviews de novo." *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim.

---

[13] We consider the convening authority's declaration as necessary to resolve errors "raised by the record but [ ] not fully resolvable by the materials in the record," namely the contradictory advice to the convening authority. *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020).

App. 2018) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). Failure to comment in a timely manner on matters in the SJAR or matters attached to the SJAR waives or forfeits any later claim of error unless there was plain error. *Id.* at 614; R.C.M. 1106(f)(6). In analyzing for plain error, we assess whether "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Kho*, 54 M.J. at 65 (citations omitted). In terms of how an SJAR error potentially affected an appellant's opportunity for clemency, the threshold for prejudice is low: there must be a colorable showing of possible prejudice. *United States v. Scalo*, 60 M.J. 435, 437 (C.A.A.F. 2005). This low threshold "reflects the convening authority's vast power in granting clemency and is designed to avoid undue speculation as to how certain information might impact the convening authority's exercise of such broad discretion." *Id.*

As the Government concedes the errors in the SJAR and addendum, our analysis focuses solely on whether Appellant suffered prejudice. To be sure, conflicting guidance from the staff judge advocate about the power the convening authority had to affect the findings and sentence should have generated confusion. If the convening authority was confused about his ability to affect the findings, we note Appellant did not request any findings be disapproved in clemency. We find no colorable showing that the convening authority nevertheless may have done so if he had been accurately advised. Appellant did request the convening authority reduce or completely disapprove the sentence to confinement. Without more, the conflicting guidance to the convening authority might meet the low threshold for prejudice.

Whether an appellant was prejudiced by a mistake in the SJAR or the addendum generally requires a court to consider whether the convening authority would have taken action more beneficial to the appellant had he or she been provided accurate or more complete information. *See United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996); *see also United States v. Harris*, 52 M.J. 665, 670 (A. Ct. Crim. App. 2000). However, in this case we need not speculate about the convening authority's decision had he received clear and accurate advice. We have no cause to doubt the convening authority's declaration that he would have approved the findings and sentence as adjudged. Based on our review of the record and this declaration, we find "a properly prepared [SJAR and] addendum to the recommendation would not have resulted in beneficial action by the convening authority." *Harris*, 52 M.J. at 670. As Appellant is unable to demonstrate a colorable showing of possible prejudice, we find he cannot prevail on this issue. *Scalo*, 60 M.J. at 436–37.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court